Case number 25-3104, United States of America v. Robert P. Burke, Appellant. Mr. Parlatore for the Appellant. Mr. Hill for the Appellee. Mr. Parlatore, good morning. Good morning, Your Honor. I'd like to reserve two minutes for rebuttal. May it please the Court. Admiral Burke was convicted of bribery on several errors. This was a conviction that was obtained through a carefully edited interview made to look like it was a confession without the proper context. It was brought by hearsay statements from a witness that they chose not to call because of significant credibility issues that we were not then allowed to introduce through 806. It was brought through a hearsay declaration of a co-conspirator that was outside the scope of the conspiracy and that we were not able to also bring an impeachment material on. All of these things, it was an interesting case where rather than, you know, the usual where we're complaining about what was admitted, here the government took the case and tried to show the jury only very narrow slivers of information without allowing them to see the full context. You know, this was a very carefully curated case of not showing the full scope of everything. Our first point, the 106 issue. What they did was they took a very long interview with agents. And during that interview, there was a lot of material discussed, but in very explicit detail, all of the events leading to this case. And then they took out, they cherry-picked the tiny little slivers that they wanted the jury to hear. Not nothing, you know, none of the rest of the context. And then when it was put in front of the jury, we wanted to, you know, through the doctrine of completeness rule 106, show the full context. And the judge found that on one of those answers that they should have at least given the full answer instead of just half of the answer. And so at that point, even though that full answer was responsive both to that quote, as well as to the first clip that they put in, at that point, the U.S. attorney withdrew that section to try to prevent the jury from being able to see the full picture. Did you argue to the court at that point that it needed to be added both for clip C and clip A? Yes, Your Honor, we did. And by doing that, we then got to see on their closing arguments exactly what this was about, where they improperly argued to the jury that he had initially lied, and then when confronted, he then confessed to the bribery. That is not what happened. It is not, you know, if you actually were able to see the full transcript and the full interview, that is not the impression the jury would have gotten. And they only got that because of that careful editing. So I think one of the things the government says is that the, you know, more helpful statement or clarification, as you might put it, came much later in the interview. And there are a lot of cases that rely on that sort of timing difference in order to say it's not an abuse of discretion to not complete a statement under 106. What's your response to that? Well, here we are talking about it is a single interview. We're not talking about, you know, we're not talking about things that are so removed in time. It is an interview where they continued to go through these things, and he was providing more detail and more context throughout. So it's not that he initially confessed and then spent a whole bunch of time, you know, trying to explain it away and give, you know, self-serving lies. Here we're talking about he was explaining this in detail, giving them more information, and simply because they appear at different points in the transcript doesn't in and of itself, you know, say that that's not, you know, that that doesn't satisfy completeness. Yeah, so I appreciate that. In clip A, he sort of just says categorically there were no job discussions. Later, he says, essentially, they were talking about job. Right. And I was listening. Correct. Why is that so from initially you admit guilt later, you try to deny or explain it away. And what the cases say is this is really focused on taking a utterance, a statement out of context. So you certainly wouldn't want to cut off a statement halfway through, but it's just literally true that he said, no, there were no job discussions at that meeting. Right. Correct. Because they had brought it up, and it was something that he did not respond to because he was not able to talk about it at that time. They certainly did bring it up. And later, he explained that, yes, they brought it up. And he gave that explanation. That is consistent with what he later told the ethics advisor. It is, you know, completely consistent throughout that, you know, yes, they did bring it up. He did not respond. And then, you know, we had a significant, you know, discussion at the trial where they brought in the former judge advocate general who explained the rules of if there is that type of thing and it's rejected and you don't continue to discuss it, then under the ethics rules, that's not something that falls under the disclosure requirements. Additionally, if there's no further discussions, you know, for a period of months, it's something that, you know, essentially becomes stale. So, that important context of what actually happened in that meeting is necessary to then match up to the rules as they presented it through those witnesses. So, turning to Denise Canedo. Denise Canedo was the original complainant in this case. She was the only witness who, you know, is not a defendant who observed this meeting where the alleged quid pro quo was discussed. And throughout this entire time, she was being held out as the government's star witness. And then they chose not to call her because she has such massive significant credibility issues of a prior finding by a state court judge that she had lied, of prior lies, you know, to the case. And so, by then, you know, withdrawing her as a witness and instead putting in hearsay statements, you know, we were told at the time by the judge, you can deal with these credibility issues on cross-examination of her. You can inquire of the agent. And then when we tried to cross-examine the agent on these credibility issues, we were shut down. We weren't able to do it. This, you know, really comes across... What's in the record of you doing just that? We were not able to do it to the extent necessary. We were able to ask a few introductory questions and then we were shut down from going any further. What questions did you, what's the record show as the questions you wish to ask? And the judge said no. He had stopped us before we could get into all of the rest of the questions. You know, she, there and you preserved an objection. It's the cross-examination of Special Agent Gardner. I don't have the specific citation in front of me. Give me one of the questions you wanted to ask and weren't allowed to ask. So, we wanted to get into all of the facts of the prior court determination that she had lied. That was one of the major... You guys even argued it at closing, right? We did, but not to the extent necessary. I don't know what you mean to the extent necessary. So, the information was allowed to be in. Correct. And then you wish to do... Right. Under 806, we are allowed to bring information in the same way that we would have cross-examining the witness had she appeared at trial. Yes, we got into the fact that there was, you know, that. But to get into the deeper facts of it, of what the lies were, that she did it under oath, that it was a, you know... I thought you got out that she lied to a judge in a court hearing against someone who was, she'd been previously romantically involved with. I guess a husband. So, our position is... Is that right? Yes, but our position... So, what more did you want to get out? The details of that. How would the details change? The credibility point is she lied under oath and she did it to harm someone that she'd previously been involved with. That's what you want the jury to hear about this case. Correct. Why would the exact words that she said under oath matter? It's important. It's exactly what we would have been able to do had she taken... You keep telling me what you would have been able to do. I don't know. Tell me what words you weren't able to get before the jury. We weren't able to get the nature of the allegations, you know, that this was... The nature of the allegation is you definitely got out that she testified under oath falsely to try to hurt someone she'd been previously involved with. Accusing him of a crime of sexual abuse. And... But that, I don't understand why getting the sexual... What the sexual abuse has to do with anything related to this trial. It shows the degree to where we're not just talking about she can lie and say, oh, my husband was mean to me. That she's willing to lie and accuse somebody falsely of a very serious felony, which is exactly what she was doing in this case. And so you tried to ask, get sexual abuse in and the judge said no? Yes. Okay. So, aside from the curtailment of the cross-examination, the text themselves were hearsay that shouldn't have been admitted. They were brought in under the pretext that this was for the effect on the listener and then used very explicitly in the closing arguments for the truth of the matter asserted. You know, her statement, and I say I only have four seconds left. If you want to finish your thoughts, go ahead. Her statement that the salary was $500,000 a year doesn't appear anywhere else. They use that on the closing argument for the truth of the matter. That's not something he even responded to, so it's not something he adopted. It was purely used for the truth of matter asserted, which is not the reason that they claimed it was to be admitted. I just... Go ahead. Can I just briefly ask a few questions about the bribery instruction? Yes. So, it seems like the real concern there is what's decrystallized in the reply brief, which is that there is one sentence that does suggest that corruptly is satisfied if the defendant understood that others expected him to be influenced in an official act. Is that the inclusion of that language is really the core of your complaint, right? Because the instruction says at least four other times in other places, specific intent is required.  Okay. So, I just want to give you a chance to answer the following question, which is, why isn't that an invited error? Because that problematic language that I just summarized was in the joint proposed jury instructions. And so, one way to look at this would be you did ask for more additional language, but you never said, judge, this sentence, this problematic knowledge type sentence can't be in the instructions. In fact, you proposed it and that could be treated as an invited error. Do you have any response to that suggestion? I think that if you had taken both of those proposals and put them both in, that would have cured the error. But by putting one in and not the other, that would be the problem. Okay. I just want to understand why that is. Because it would still be that you have two sentences next to each other. One says, something like knowledge is enough. And the next sentence would say, you need specific intent. So, it would still be, I think, pretty confusing to a jury, even if you had gotten what you wanted. It would have been better to compress them into a single sentence. It would have been better. Yes. Did you ever propose that? I don't believe we did. Did you ever tell the judge that you've got a problem with the word understanding in the instruction you proposed? I don't recall that specifically. We shouldn't have agreed to that. We didn't mean to propose it. I don't recall that. All you did was you wanted, you affirmatively asked for an instruction that would have preserved the understanding language, as Judge Garcia points out, the knowledge language. And then would have added a contradictory specific intent instruction. I don't remember the exact exchange, Judge. But yes, that sounds about right. Thank you. Mr. Hill. May it please the Court. Dietrich Hill on behalf of the United States. The defendant raises a wide variety of challenges to his bribery and related convictions. None has merit, and this Court should affirm. I'd like to turn first to this 106 issue with respect to this long interview. The timing makes a big difference because the fact that this later statement that the defendant wanted to get in, covers the same subject matter as a much earlier statement, is not sufficient to show that it's necessary context to make the earlier statement not misleading. The district judge pointed out that there's a 45-minute difference here or something along those lines. And the interview could have ended much earlier. The interview could have ended after the first statement or shortly after the first statement. And this later exculpatory statement by Burke never would have come in. And that's the point of having the district judge do this kind of balancing under an abuse of discretion standard, because it may be difficult in some cases to tell what context is necessary. But here it was well within the district court's discretion to say, look, this is a totally different statement. Sure, the defendant wants to get in. Some hearsay that he's come up with after a long time to think about what explanation. I don't, I don't, this isn't like it was a day or half a day. 45 minutes in an interview isn't long. We have arguments to go longer than that. And we keep just talking about the same things. I don't understand this 45 minutes passing thing because he kept talking about the same stuff. Different aspects of the story coming at it from different angles. We kept talking about the same thing. Sure. And so the question is, then, was this information going to prevent a misimpression in the jury that would be caused by just letting the first part in? But I don't think it is particularly significant that the subject matter is the same. The question is whether that first statement was misleading, kind of in and of itself, that statement on pages 48 and 49. The question isn't inherent misleading. It is knowing the other stuff. Is it looking at the picture as a whole? Is that misleading? Are you truncating the full, his full expressions during an interview? I think it's very common.  I think it's very common when there's a long interview, you know, a statement that a defendant is giving to an agent, that there's going to be statements earlier on. And then later on, the defendant is going to come up with other stories. I mean, 45 minutes, sure. It's not days. Yeah, and sometimes, actually, they get more truthful towards the end than the beginning. So, I mean, that's something you could bring out on cross-examination. I just don't understand, you know, if you want to go, those are, yeah, those are two inconsistent statements. You can point out, well, you know, now you had some time to think. Or now you realize what the, based on subsequent questioning, you realize what the consequence of that first statement was. I mean, that doesn't make it not inconsistent and not unfair for the jury to withhold from the jury the, his full explanation of a specific event. I would just say that it's basically a judgment call by the district court as to what counts as context and what counts as later exculpatory hearsay that the defendant wants to get in. 45 minutes later isn't, I don't understand the rationale for that. But it's, I mean, I think courts regularly say, look, if it's the remainder of an answer, if it's the next thing the defendant says, that's context. But even within a single 20-minute phone call, for example, if you say something inculpatory toward the beginning of the call and exculpatory toward the end, that second exculpatory statement isn't necessarily context for the earlier statement if they're separated by some other discussion. They can. I mean, you just look at what was said to figure out whether it's pertaining to the same matter and is answering essentially the same question, right? If somebody said something up front, you know, gosh, while I was there, I said out loud, I can't believe I'm doing this. This is really bad. And then 45 minutes later, they go, yeah, I was stone drunk or high on drugs the entire time I was there. I was saying all kinds of crazy stuff. Wouldn't that be needed?  I don't think so. Because I think the first statement, well, but if it comes much later in the interview, then no. I just said 45 minutes. I mean, I think we have different definitions of much later. That might be right. But I mean, these interviews are almost always focused on one subject matter for a long period, right? There's going to be one crime at issue that. But it's just definitely out of context, you definitely need for context to understand why he said what he said in the first time. I think that's a situation where the defendant, if he wants to get in his explanation, would need to testify about it. He can't come up with. The point of this rule is not to say the government can clip anything it wants, exclude anything it wants, as long as it's not the very next sentence. And then your only other option is to take the stand. The whole point of this is to recognize that that's not, the rules of evidence are not meant to be a weapon for pressuring defendants to surrender their Fifth Amendment rights. That is not what the rule is supposed to be doing. That is true. All right, so then there has to be, and it's balanced, I take that, but it has to be a fair opportunity to ensure that what the government's putting in is not clipped and truncated in ways, omitting things that are on the very same topic and would be relevant to it, just because the agent got in and asked a few other questions in between. I mean, to be honest, I think the fact that we are having this debate about what counts as context and what counts as misleading and what counts as an omission is why this is a matter of discretion. Well, that's going to happen in any case on appeal. We're going to ask some questions and that doesn't mean it's not an abuse of discretion. It just seems like this is kind of the core domain of the district court to determine, to look at particular statements. Is it unreviewable by us? No, of course not. Of course not. But in terms of determining what counts as context and what counts as an omission and what counts as misleading. Well, I don't know how it's reviewable if we can't decide whether something was context. I mean, that's what we have to decide if we're going to be able to review this and whether it was answering the same question and whether it was sufficiently important that the jury needed to have it, to have a fair understanding of what was actually said during that interview. We get to decide those things, right? Sure, sure. I'm just suggesting that this is there. It's very useful to have the district court be looking in first instance. I would also point out that actually, I'm not sure it matters whether the second statement was important. The question is whether the first statement was misleading without the context. Do you have cases that apply this rule in the way you were saying, specifically something that looks like the 20-minute phone call where at the beginning he says, I totally did it, and then later says, I didn't do it? I think we cite a case in our brief that I think is from the Fourth Circuit where it's a brief phone call. It's not an interview. It's a phone call that comes in between, I think it's a jail call. And at the beginning, he says something like, I possess the gun. And then 15 minutes later, something he says, no, I definitely didn't possess the gun. And the court says, no, no. When you say you possess the gun toward the beginning, and then later on, you decide that that was a bad idea to say, that's hearsay that you're trying to bring in on your own. That's an exculpatory statement. It's not like I possess the gun, but I thought I was allowed to, or it was in my car, but how was I supposed to know? Where then the government's trying to cut off, where it was in my car, period. I think that would clearly be that would come in under 106. And the other case that I think was quite useful is the 11th Circuit case that we cite, where there were a couple of instances in this long interview, where the court said, this has to come in. You're cutting the defendant off mid-answer in this interview. But of course, the whole interview related to, in this case, whether or not this person was improperly importing antiques or ivory or both into the country. And he later makes some statements in the interview, saying things like, well, I was sure I was allowed to do this. I've done this before. I followed the regulations. And the court said, no, no, that comes an hour later or something. That's not necessary context to make the first statement misleading, not misleading. I'm happy to answer further questions. Yeah, I just, I'm trying to. So regarding Ms. Canedo's testimony about the $500,000 salary.  Why was that needed for context? I get that you had to have the, her quote about that, you know, it was a 10%. You had to have a predicate. You couldn't understand Edwin Burke's explanation without the predicate question of was it 10% equity or 10% of commission, essentially it sounded like. That's all you needed. The $500,000 had nothing to do with the statement he later made because all he did was explain the equity issue or the 10% issue as equity. Why did the $500,000 need to come in? Because the $500,000 does actually show a different meaning to Burke's response. When you say, if she had just asked, was there a 10% discussed and he'd said, yes, 10%, that would mean that they both heard something about 10% at the meeting. No, no, but he couldn't. Once you have her question, was it 10% equity in the entire business or just whatever project she worked on, then his, and I forget his exact quote, but was it, you know, essentially said 10% equity. But that's perfectly clear now. She's, that information has done it. I don't know what the $500,000 is clarifying. Because it allows the jury to make a fair inference that when she says 500K, and he doesn't respond, those are the two terms she mentioned, 10% and 500K. And his response clarifies what the 10% was. The jury can reasonably infer with that context that he agrees he also heard $500,000. I mean, I'm not sure that's a reasonable inference. She just put the LOL in there and he's just not paying attention to whatever, you know, the sort of joke, babble, LOL stuff is coming out. He's focused on, you know, at this point, he's an admiral, got a lot on his plate. He's focused on answering her equity question, which he does very quickly and curtly. Well, but it is part of a much longer discussion where he starts- But you're not allowed to get all that stuff in for context. No, now most of these I would also point out are questions that wouldn't be hearsay to begin with because they're not offered for the truth of the matter asserted. You're definitely, you definitely guys, you guys just definitely argue the 500K as- Yes. No, no, I would- Oh, it's hard to come on. I would, well- Is it an argument? I would point specifically to page, to the rebuttal. It's, I think, page 570 of the record, the appendix, where what the prosecutor says is she was asking questions. And in fact, she, the prosecutor characterizes the 500K as part of the question, which is not quite right, but I think shows that the government was not trying to offer this for its truth. And then the prosecutor says he was reading from the same sheet of music. He was affirming that what she heard, he heard too, and there was an offer. That's the point that the prosecutor is trying to make. And by characterizing the 500K as part of the question, the prosecutor is saying that that's not a statement. We're not asking you to rely on that 500K. We're asking you to rely on the fact that he was affirming that he heard the same thing. And that's true. Right, so that's an adoption argument that by silence and responding in the general same subject without refuting 500K, he's adopting the statement. Did the district court admit the 500K text on that basis or just on the effect on the listener basis? The district court described it as effect on the listener and context. Although at a different point, the district court actually said, oh, I view this as an adoption. Now, I think the trial judge was thinking of it as an adoption in the sense of this is showing what's on his mind. It's going to his state of mind. But all of these are very similar. And all of them are similar in the fact that we're not relying on the 500K in and of itself. We're relying on what it shows about his text. Because what it shows is you can treat it as context, like what does this text mean in context? You could treat it as his state of mind. What did he intend when he texted this? Or you could treat it as an adoption when he corrects part of her statement. Essentially, he is agreeing with the remainder of her statement. But all of those uses show that it wasn't being argued for its truth. I mean, the 500K, of course, we're trying to prove that that was true. But we're trying to prove that it's true because he agreed with it. And in terms of what's persuasive to the jury, frankly, I think what's persuasive is that he was agreeing with it and not that she said it in a vacuum. Can I ask you about this, the no contract, no job email text? What exactly is your, what was the conspiracy that was ongoing on that date? Is it the charge criminal bribery conspiracy? Or are you just relying on the theory that the word conspiracy in that rule can refer to a lawful joint enterprise? What we suggested and what we argue here is that the conspiracy continued past the charge date. It wasn't limited to exactly what was alleged in the indictment, which is correct under the rule. And it doesn't matter what we're pointing out, particularly on appeal. I don't think the district court relied on this, but it doesn't matter whether that joint venture, which started illegally, was still illegal at the time that this text was sent. The court doesn't have to make a judgment about whether this is still part of an illegal bribery conspiracy or whether they'd moved on to a legal joint venture. Because the latter is sufficient. Because the latter would be sufficient. But when would that ever end? You're describing this as essentially, it was ongoing because part of the deal was a long-term goal of getting a lot of good business for the company. And that would lead to a view that anything that they ever said, I guess, at least until he was, until he left the company, was part of a conspiracy. Well, I think as long as he's working for the company and working to try to get big contracts, because that started, and that's part of the same plan, ultimately, that started as an illegal bribery plan and has continued because they didn't achieve their objective yet of getting this big Navy contract. I think it's probably right that as long as that plan continues in place, even if it's become, you know, they're no longer committing bribery, but because it's part of the same joint venture, yes, that all would be co-conspirator statements. And I think that's consistent with this court's decision in Brockenborough, where it said, look, it doesn't matter whether they were already, it was the reverse there, where there may have been a legal joint venture that turned into an illegal conspiracy. And this court said, look, we don't have to determine whether they were doing anything illegal in June because they were trying to buy this property together. Later on, they were illegally conspiring to commit fraud to get this property. But this was all part of one long-term joint venture to acquire the property and we don't need to decide whether they were doing anything illegal at a particular point in time. Did you argue a lawful joint enterprise below? No. But I would say that this was teed up very briefly. That was not argued below, so we don't have any district court determination on that. The indictment is quite explicit that the only criminal act charged to Attenborough is that he engaged with the bribery, official act bribery, which of course could not have continued, could not in any form have continued once he was no longer an official, once he left the Navy. I think the conspiracy could have continued if it- You didn't charge him with doing anything. The indictment is very narrow. I mean, it's covering what it covers in time. I agree, I agree. It's only official act bribery. Maybe you would have some enterprise between Kim and Messenger that would continue. But all you've got- With the district court- He has to be acting as official actor. You're going way beyond the indictment. But we're not bound by the indictment for this evidentiary purpose. I know that the defendant cited several cases suggesting the government's bound by the indictment. All of those have to do with the statute of limitations and not with this evidentiary rule. And it makes perfect sense because this rule applies whether or not there's a charged conspiracy at all. No, but you kept arguing that the charged conspiracy continued long before the indictment. I mean, it was your phrase, the charged conspiracy continued into the time of this message. That's what you told the district court.  It's a serious thing. Well, and I believe the indictment actually says through October, and this was in October. As, again, maybe between Kim and Messenger, not here, not before, not at issue here. Couldn't have been for Admelberg because his is only official act bribery. He's no longer an official at the time of this statement. That's true. Although normally, I would suggest that the government's permitted to, for example, charge that the conspiracy was still attempting to conceal the conspiracy. So even if he was no longer at the Navy- Nothing about this statement is concealing anything. She's on record, again, assuming that it's true what it says, she's on record saying, you know, the no job, no contract. That's not cover-up. Well, that's a- I mean, they might be covering it to everybody else who's not in the conspiracy. I mean, this is two co-conspirators. It doesn't- Okay, I read it as her just describing past events and what she's groused about and been upset about. It's partly retrospective, certainly. But the other thing that she's saying is Admelberg has gotten here. He's gotten his salary. Maybe he's not interested in continuing. That's not a cover-up. No, no, I'm sorry. And this is even further interference of the conspiracy because she's encouraging continued participation when she said- when she says he works for us now. In other words, we still need to get something out of this. We need to get something out of him because we've offered him this job and we didn't get the big contract that we were hoping for. We need him to be working for that big contract. But that's not- I thought it was a bribery conspiracy. Yes. Official act bribery conspiracy. Yes. Not going to get that out of him. No. I see my time- my time has run over. Okay. Thank you very much. We ask the court to affirm. All right. Why don't you take two minutes? Just now you were discussing about the 500,000 and why that was important. The reason why that was important is that's what they used on their closing argument because the 500,000 versus the 10%. 10% they didn't use in the closing argument because that had nothing to do with what the ultimate job was. And so if you took that, the 500,000, as they should have under the rules of evidence, there was nothing there that actually described what the ultimate job offer was. That's why they needed the 500,000 for the truth of the matter asserted. So I'm not understanding why we're going to pay you by giving you 10% equity in the company. That was not- I don't understand. I guess I'm not understanding this argument. The ultimate job offer that was accepted in his employment arrangement did not involve that 10%. That wasn't the point. The point was at the time that's what they were offering. Correct. Correct. But in closing, they argued that this described exactly what the job ultimately was. So that's why the 500 was important. But the thing also to remember is- Right, right. I'm just taking the facts in light. Most favorable to the verdict.  If he agreed while still in the Navy-  I'm going to come work for you with this great 10% of the company salary. I'd rather have stock anyhow that will grow, grow, grow. And before I go, I know what I'm going to do. I'm going to get you this contract. Right. We have just as much bribery regardless of when he got there. And they said, would you rather have 10% or 500,000? He said, I'll go with 500,000. I don't understand what that has to do with anything.  But our position is that he did not accept that offer at that time. That was something that he said, in the excluded portions of it, of the interview, that he pushed them off and he only began having discussions much later. And this is one of the problems is that you take these little snippets, a little snippet of the text message here, a little snippet of the interview there. You put together little pieces without allowing the jury to see the entire scope of everything. And we've raised a bunch of different issues here. And obviously we think the 106 issue is the most salient here, but there's also just the totality of the circumstances. And one thing that we cannot escape is that there was a second trial here where they didn't have this same issue and that was a hung jury. So there's no way that we can say that this is harmless error. All of these errors combined to deprive Admiral- Second trial. Of Kim and Messenger. And so all of these errors combined to deprive him of that fair trial. And therefore we ask that you reverse. Do you dispute that you guys could have called Ms. Kaneda to the stand? In reality, no, because when the government does that and just simply says, well, you could have called her, to put a defendant into the position where we have to call a government witness who's been openly hostile to us solely for the purpose of impeaching her credibility. Her whole point is that she should have been on the stand, whether you call her or she call, you call, it doesn't matter. Your whole point is she should have been on the stand so you could question her. Correct. That's your whole argument. And so you could put her on the stand to question her and you would get to decide what questions you ask on direct. But the only purpose to call her would be to impeach her credibility. And that's not, you know, by... One case says, it's a missing, it counts as a missing witness if what you want, the reason you want the person on the stand is to, I mean, this always comes up in this context, is you want to impeach them. And a missing witness is not just about whether we had the ability to subpoena her. It's about whether she was peculiarly within their control. She was with them the entire time. She's a government employee. She works for them. So everything about her made her peculiarly within their control. Simply the fact that a defendant could have subpoenaed somebody, because if that's the... I'm just asking you, you don't dispute that you could have subpoenaed her. We could have, but that is not the standard. You didn't want to. If the ability to subpoena a witness always defeated the missing witness charge, then we might as well throw it out. So that's not the standard, you know, just because somebody could have subpoenaed them. So. All right. Thank you. Thank you.
judges: Henderson; Millett; Garcia